# EXHIBIT B

*(to Declaration of Eric A. Grover ISO Motion for Preliminary Approval of Class Action Settlement)*

1 OF 3

**CARPENTER LAW GROUP**
TODD D. CARPENTER (234464)
432 West Broadway, 29th Floor
San Diego, California 92101
Phone:       (619) 347-3517
Facsimile:    (619) 756-6990
Todd@Carpenterlawyers.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE LUMOS, On Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO., a Texas corporation, and DOES 1 through 20.<br><br>Defendants. | Case No.: **'13CV0342 JLS  BGS**<br><br>**CLASS ACTION**<br><br>1.  VIOLATION OF THE FAIR AND ACCURATE CREDIT TRANSACTION ACT; 15 U.S.C. §1681c(g)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jamie Lumos brings this action on behalf of herself and all others similarly situated against Southwest Airlines Co. and states:

### NATURE OF ACTION

1.      Congress amended the Fair Credit Reporting Act ("FRCA") in 2003 through the passage of the Fair and Accurate Credit Transactions Act ("FACTA"). FACTA was enacted to curb identity theft and fraud by requiring businesses and merchants who accept debit cards and credit cards (collectively, "payment cards") for the purchase of merchandise to truncate the *expiration date* and all but the last 5 digits of the payment card number from all payment card receipts electronically printed during the transaction. *See* 15 U.S.C. § 1681c(g)(1)(emphasis added).

2.      Congress enacted FACTA with the intent of helping to prevent the possibility of thieves stealing the identity of another by obtaining one's payment card

number and the expiration date of the payment card. Businesses generally require one's payment card number and the expiration date of that payment card to transact business. Access to both the card number and the expiration date of the card makes it easier for a thief to commit identity theft.

3. This truncation requirement was specifically intended to protect consumers from the likes of dumpster divers and other would-be perpetrators of identity theft and credit card fraud by making it more difficult to obtain discarded receipts that contain a card owner's entire card number and/or expiration date.

4. The truncation of the expiration date of the payment card prevents would-be identify thieves from one piece of a card holders' full payment card profile, which includes: the consumer's name, address, payment card number, expiration date, and/or the security pin.

5. Defendant Southwest Airlines Co. ("Southwest") is the world's largest discount or low cost carrier, headquartered in Dallas, Texas. Southwest was established in 1967, adopting its current name in 1971. Classified as a major carrier, it carries the most domestic passengers of any U.S. airline.

6. Except for a few years during the 1970s-80s when it operated Boeing 727s, Southwest has solely operated Boeing 737s. As of August 2012, Southwest is the largest operator of the 737 worldwide with over 575 in service, each operating an average of six flights per day.

7. Southwest has more than 46,000 employees and operates approximately 3,400 flights per day. As of January 2013, Southwest Airlines has scheduled service to 78 destinations in 39 states.

8. Despite being a sophisticated merchant, who routinely and in the course and scope of its normal business practices accepts both debit and credit cards for the purchase and sale of airline tickets, Southwest failed to comply with FACTA in that it does not truncate the expiration date of payment cards on the electronically printed

receipts it provided to customers at the point of sale at ticket counters located in airports across the country, and including the ticket counter at the San Diego International Airport, Lingbergh Field during the proposed class period.

9.      As alleged more fully herein, Southwest is aware of the truncation requirements proscribed by 15 U.S.C. § 1681c(g)(1), but willfully disregarded them by printing the entire expiration date of its customers' payment cards on the customer's electronically printed payment card receipts at the point of sale at its ticket counters in several airports across the country, including, but not limited to airports which service Southwest Flights in Phoenix, Las Vegas, San Diego and Nashville.

10.      A "willful" violation of FACTA, 15 U.S.C. §1681c(g)(1), imposes mandatory statutory damages for each violation. The minimum amount of damages is $100.00 per violation up to a maximum of $1,000.00 for each violation.

## JURISDICTION AND VENUE

11.      This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and some of the members of the Class are citizens of states different from Southwest.

12.      This Court has personal jurisdiction over Southwest because Southwest is authorized to do and does business in California.  Southwest has marketed, promoted, and sold its airline travel services in California and Southwest has sufficient minimum contacts with this State and/or sufficiently avails itself of the markets in this State through its promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible. Further, thousands of retail payment card purchases were transacted within the State of California. Southwest willfully violated 15 U.S.C. §1681c(g)(1) in a systematic, routine basis at its California ticket counter(s), and continues to do so to this day.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while she resided in this judicial district.  Venue is also proper under 18 U.S.C. §1965(a) because Southwest transacts substantial business in this District.

**PARTIES**

14.     Plaintiff Jamie Lumos resides in San Diego County, California.  On approximately May 3, 2012, Plaintiff Lumos made a purchase with a payment card at a Southwest ticket counter at the San Diego airport, Lindberg Field. After handing the Southwest employee her payment card, the employee swiped or otherwise entered the payment card information into the Southwest ticketing system and provided Ms. Lumos with a ticket to travel to San Francisco.  After Ms. Lumos completed the purchase transaction, she received her ticket and a copy of the air travel receipt.  The receipt contained, among other things, the last four digits of her credit card number and the four digit expiration date of her credit card. The payment card number was truncated, in accordance with 15 U.S.C. §1681c(g)(1) – meaning, 12 of the 16 digits of her payment card were crossed out (by way of example: "XXXX-XXXX-XXXX-1234) or properly truncated. The remaining four digits were not.  However, her ***entire*** four digit expiration date was electronically printed and un-redacted in violation of 15 U.S.C. §1681c(g)(1).

15.     Defendant Southwest USA, Inc., is a Texas corporation, with its headquarters at 2702 Love Field Drive, Dallas Texas 75235. Southwest, along with its wholly owned subsidiary(s), now serves 97 destinations in 41 states, the District of Columbia, the Commonwealth of Puerto Rico, six near-international countries, and employs approximately 46,000 people. Southwest is a sophisticated merchant which primarily generates sales through its website, but it also routinely accepts credit and debit cards for the payment and purchase of airline travel at ticket counters in several airports across the United States. Southwest is in full compliance with FACTA through its website, but did not comply with it for sales made at its ticket counters in numerous

airports throughout the country during the proposed class period.

## FACTUAL ALLEGATIONS

**History of FCRA and FACTA**

16.     The FCRA was passed in 1970 in part "to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." Fair Credit Reporting Act (FCRA), 15 U.S.C.§§ 1681– 1681x (2006). However, as identity theft increasingly affected U.S. consumers through the early 1990s, critics of FCRA were concerned that FCRA did very little, if anything, to prevent identify theft from occurring.

17.     The Fair and Accurate Credit Transactions Act of 2003 ("FACTA") was enacted in part to address the security practices of merchants who accept payment cards (credit and debit). FACTA targets a very narrow problem; the publication of credit card numbers and expiration dates on electronically printed (not handwritten) credit card and debit card receipts. Congress amended the Fair Credit Reporting Act ("FCRA") in 2003 through passage of the Fair and Accurate Credit Transactions Act ("FACTA"), which focuses on curbing identity theft and credit card fraud. Several provisions within FACTA are specifically intended to combat identity theft and empower consumers to better monitor their credit and financial situations. *See* The Federal Trade Commission's "FTC ISSUES FINAL RULES ON FACTA IDENTITY THEFT DEFINITIONS, ACTIVE DUTY ALERT DURATION; APPROPRIATE PROOF OF IDENTITY, http://www.ftc.gov/opa/2004/10/facataidtheft.shtm (last viewed May 9, 2012).

18.     FACTA included provisions that permitted consumers to acquire one free credit report on an annual basis from each of the three major credit reporting agencies, Equifax, Experian, and TransUnion. FACTA also established "fraud alerts," which permit customers to "flag" their credit files if they feel they are at risk of identity theft. *See*

*generally*, 15 U.S.C.§1681c1-2.

19.     Most importantly, FACTA mandated the truncation of vital account information on credit and debit card receipts.

20.     Section 1681c(g)(1) of the FCRA – enacted as part of FACTA – requires businesses to mask credit and debit card numbers and suppress the printing of card expiration dates on electronically printed consumer receipts as follows:

(1)     In general.  Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number *or* **the expiration date** upon any receipt provided to the cardholder at the point of sale or transaction.  *See* 15 U.S.C. § 1681c(g)(1)**(emphasis added).**

(2)     Subsection (g)(2) provides that these requirements **apply only to electronically** *printed* **receipts**, and do not apply to transactions where the sole means of recording the account number is by handwriting or an imprint of the card. 15 U.S.C. § 1681c(g)(2)(emphasis added).

21.     Any person who *willfully* fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of:

(1)     (A) any actual damages sustained by the consumer as a result of the failure or damages of *not less than $100 and not more than $1,000*; or

(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;

(2)     such amount of punitive damages as the court may allow; and

(3)     in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court. *See* 15 U.S.C. §1681(n) (emphasis added).

22.    A private right of action exists under 15 U.S.C.§1681c(g)[1]

**The Risks of Identify Theft FACTA helps to prevent**

23.    The FTC estimates as many as 9 million Americans have their identity stolen each year.  The FTC recognizes that "theft" and "dumpster diving" are two of the most     prevalent     sources     of     identity     theft.    *See* http://www.ftc.gov/bcp/edu/microsites/idtheft/consumers/about-identity-theft.html.    (Last visited on May 4, 2012).

24.    The act of "dumpster-diving," occurs when perpetrators sift through dumpsters and trash bins outside businesses and residences to look for documents and discarded receipts that can divulge a variety of personal information, such as phone numbers, social security numbers, financial account numbers, and credit card numbers.  A popular method of carrying out credit card fraud by this method occurs when the perpetrator finds a discarded pre-approved credit card offer along with the information necessary to activate the card in the victim's name. Victims often do not think twice about throwing away these types of pre-approved offers, as well as bills, credit card statements, and bank statements.  *See* Northwestern Journal of Technology and Intellectual Property (2011), §B3, Paragraphs 18-19.

25.    Perpetrators of identity theft can readily assemble the pieces of a customers' payment card profile (including the payment card number and expiration date), using, among other things: 1) discarded receipts which contain the expiration dates of payment cards; 2) discarded debit card bank account credit card account statements; or 3) other personal documents which contain references to the payment card number.

---

[1] Every court to consider whether a private right of action exists under the section at issue here, 15 U.S.C. § 1681c(g), has decided that it does. *Arcilla v. Adidas Promotional Retail Operations, Inc*., 488 F. Supp. 2d 965, 969 (C.D.Cal. 2007); *Leowardy v. Oakley, Inc*., SACV 07-53 CJC, 2007 U.S. Dist. LEXIS 31229 (C.D.Cal. Apr. 10, 2007) (in chambers) (denying motion to dismiss § 1681 c(g) based upon alleged lack of private right of action); *Eskandari v. IKEA U.S., Inc*., No. SACV 06-1248 JVS, 2007 U.S. Dist. LEXIS 23007, 2007 WL 845948, *2 (C.D. Cal. Mar. 12, 2007); *Aeschbacher v. Cal. Pizza Kitchen*, No. CV 07-215 VBF, 2007 U.S. Dist. LEXIS 34852 (C.D. Cal. Apr. 3, 2007).

26.     Once assembled, identity thieves are able to make "Card-Absent" purchases over the phone or through direct mail with only a limited amount of information from the victim related to their payment card profile, including minimal personal identification information, a payment card number and expiration date.

27.     For example, despite the fact many businesses and merchants require the full credit card number, expiration and security pin of a debit or credit card to complete purchases, several merchants do not require the security pin[2].

28.     Unlike in situations where the payment card is present at the point of sale, "Card-Absent" transactions present identity thieves a multitude of opportunities to exploit their ill-gotten bounties by making illicit purchases.  The growth of the mail order, telephone order (MO/TO), and Internet merchant channels means increasing numbers of merchants are now processing transactions in situations where the card and cardholder are not present—and fraud may be especially difficult to detect.  *See* Exhibit "A", Card Acceptance Guidelines for Visa Merchants; Section 3: Card-Absent Transactions, p. 46. However, Credit Card providers, including Visa, instruct their merchants at a minimum to collect only:  the card account number; the customers' name; the card expiration date as it appears on the card; and the cardholder's statement address.  Conspicuously absent from these minimal requirements is the "pin number" generally located on the back of the card.

29.     In 2006, the FTC commissioned the 2006 Identity Theft Survey Report. As a result of this report, the FTC estimated that  although 50% of identity theft victims do not incur "out of pocket expenses," victims of all types of identity theft spent hours of their time resolving the various problems that result from identity theft, and some victims

---

[2] Security pin, in this context, refers to an additional code, found today on most major credit cards, which is often required to make a card-not-present (e.g. online, over-the-phone) purchase. Different credit card issuers refer to it through a host of remarkably similar acronyms and names, such as Card Verification Value (CVV), Card Verification Code (CVC or CVC2), Card Code Verification (CCV), etc. This additional security measure helps to combat credit card fraud in cases where the perpetrator has only the card owner's name, credit card number, and expiration date off a receipt, as the security code is not usually printed on receipts. However, a variety of fraud methods are able to procure this code, so it is by no means a perfect safeguard. *See* Northwestern Journal of Technology and Intellectual Property (2011), §B3, Paragraph19. *citing, e.g.*, *Security Features*, VISA, http://www.visa.ca/en/merchant/pdfs/security_features.pdf (last visited Aug. 25, 2011).

incurred substantial out-of-pocket expenses, including lost wages, legal fees, payment of fraudulent debts, and miscellaneous expenses such as notarization, copying and postage. *See*, F.T.C.: 2006 Identity Theft Survey Report, p. 6; http://www.ftc.gov/os/2007/11/SynovateFinalReportIDTheft2006.pdf (last visited on May 15, 2012).

**The Implementation of FACTA and the Effect of the "Clarification Act".**

30.      FACTA was enacted as part the Fair Credit Reporting Act on December 4, 2003. Congress provided that it would take effect in two phases. With respect to cash registers installed on or after January 1, 2005, compliance was required immediately, while registers in use before that date were required to become compliant beginning on December 4, 2006. *See* 15 U.S.C. § 1681c(g)(3). The truncation requirement was phased in over time to allow large and small businesses to conform to the requirements and update the cash registers and /or Payment Card Industry terminals in service. Shortly after FACTA took effect in December of 2006, hundreds of class action lawsuits were filed in federal courts alleging violations of §1681c(g).

31.      In 2008, almost five years after the passage of FACTA, Congress enacted the "Credit and Debit Card Receipt Clarification Act" ("Clarification Act"). The new statute added a subsection (d) to Section 616 of the Fair Credit Reporting Act (15 U.S.C. §1681(n)). The "Clarification Act" was in direct response to the "hundreds of lawsuits" that were filed against merchants after the effective date of FACTA, alleging that merchants' "failure to remove the expiration date was a willful violation" of the statute, even though the account number was properly truncated. *See*, Clarification Act § 2(a)(4), 122 Stat. at 1565. Congress found that many merchants mistakenly believed that § 1681c(g) would be satisfied solely by truncating the card number and not the expiration date. Id. at § 2(a)(3), 122 Stat. at 1565 (emphasis added).

32.      In 2008, Congress acted to give those merchants a one-time safe harbor, from FACTA compliance through the Clarification Act, which amended FACTA to state that any

merchant who printed an expiration date, but otherwise complied with FACTA, between the dates of December 4, 2004 and June 3, 2008, shall not be deemed in willful noncompliance with § 1681c(g). Id. at § 3(a) (codified at 15 U.S.C. § 1681n(d)), 122 Stat. at 1566.

33.     Importantly, the Clarification Act did not excuse violations on a going forward basis. The printing of a payment card's expiration date after June 3, 2008 is a violation. Specifically, the quoted subsection (d) language applied only to a "person who printed an expiration date on any receipt provided to a consumer cardholder at a point of sale transaction between December 4, 2004 and the date of the enactment of this subsection," - which occurred on June 3, 2008.

34.     Critically, Congress did not amend the substantive provision of FACTA so that printing both five digits of the card number and the expiration date would be expressly compliant. It merely said doing so prior to June 3, 2008 would not be "willful non-compliance". This limitation demonstrates such conduct after June 3, 2008 could be "willful non-compliance".

35.     The purpose of the Clarification Act was to provide those merchants and businesses additional time to come into compliance with the truncation requirement for payment card expiration dates.  It essentially moved the effective compliance date from December of 2006 to June 3, 2008.  But it did not remove or in any way alter the mandate of 15 U.S.C. § 1681c(g)(1), requiring all business and merchants to truncate the customer's payment card expiration date on all electronically printed receipts made at the point of the sale.

**Southwest's Willful Violations of FACTA's truncation requirement (15 U.S.C. § 1681c(g)(1)).**

36.     Statutory damages under § 1681n depend on a violation being "willful"[3].  An

---

[3] The Supreme Court defined "willful," as that term is used in §1681n, in *Safeco Insurance Co. v. Burr*, 551 U.S. 47, 69, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007), concluding that a practice is willful when "the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  The standard set forth in the Supreme Court's decision in *Safeco Insurance Co. of America v. Burr*, which held that willful violations of the Fair Credit Reporting Act (FCRA) are assessed for reckless disregard, applies to all violations of the FCRA (including

action is "willful" when the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless. A willful violation is can be reckless, i.e. something more than negligence but less than knowledge of the law's requirements[4].

37.    Southwest was aware of the truncation requirements mandated by FACTA, (15 U.S.C. § 1681c(g)(1). In fact, it is Southwest's routine custom and business practice to comply with FACTA for sales made through its website. Southwest also truncates twelve of the sixteen digits of customers' payment card receipts at the point of sale at its ticket counters, thereby complying with one part of FACTA's truncation requirements. Yet, despite its knowledge or effort to comply with FACTA on its website and in one aspect at its ticket counters, Southwest willfully violated Plaintiff's and class members' rights to receive payment card receipts with the expiration dates of their payment cards fully truncated when making purchases at Southwest ticket counters.   Southwest violated Section 15 U.S.C. § 1681c(g)(1) by failing to truncate the expiration date of Plaintiff's payment card and those of the proposed class. No objective reading of the statute would lead Southwest to conclude that it is permissible to electronically print the expiration dates of its customers' payment cards on their receipts at the point of sale.

38.    Ignorance of the requirements will not excuse Southwest's liability, especially in light of its partial or half-hearted compliance. Further, several pertinent sources were either provided to Southwest or readily available to it which would have instructed the same with respect to the truncation of expiration dates.

39.    Southwest accepts Visa and Master Card credit cards and debit cards for

---

FACTA); abrogating *Perez v. Trans Union, LLC*, 526 F.Supp.2d 504. *Cortez v. Trans Union, LLC*, C.A.3 (Pa.) 2010, 617 F.3d 688.

[4] *See Murry v. New Cingular Wireless Services, Inc.* 523 F.3d 719, 726 (7th Cir. 2008)(*citing Safeco Insurance Co. v. Burr* 551 U.S. 47 (2007).

payment at all of its ticket counters and through its website. Southwest is a "Visa Merchant" by virtue of accepting Visa branded credit and debit cards as tender for the payment of air travel tickets. The Visa "Card Acceptance Guidelines for Visa Merchants © 2011" instructs its merchants to:

"Ensure that the Visa account number is suppressed in accordance with Visa rules and local laws and regulations. Visa recommends that all but the last four digits of the account number be suppressed on the cardholder copy of the transaction receipt, unless otherwise required under local law.

***The expiration date should not appear at all on the cardholder copy of the transaction receipt.*** Existing point of sale terminals must comply with these requirements. To ensure that your point of sale terminals are properly set up for account number and expiration date suppression, contact your acquirer."

*See* Exhibit, "A"; Card Acceptance Guidelines for Visa Merchants; Section 1, p. 13; "Suppressed Account Number and Expiration Date".

40.     Further, the FTC publishes a set of guidelines for businesses to assist them in protecting the personal information of consumers.   *See* Exhibit, "B," "Protecting Personal Information: A Guide For Business".   These guidelines instruct:

"The law requires you to shorten—or truncate—the electronically printed credit and debit card receipts you give your customers. You may include no more than the last five digits of the card number, ***and you must delete the expiration date.***"

Id. at p. 7.

41.     Southwest's violation (as to Plaintiff) occurred more than three years following the effective date (Jun 3, 2008) of the "Clarification Act".

42.     Upon information and belief and investigation, Southwest violated FACTA at multiple ticket counters and in multiple states.

43.     Visa, Master Card and other credit companies and vendors of credit and

debit card processing machines inform retailers, such as Southwest, of FACTA's requirements.

44. Southwest competitors and business peers are compliant with the requirements of FACTA.

45. Despite its sophistication as one of the largest low cost carriers in the world, its knowledge of the FACTA requirements, its attempts to comply with the requirements, its contractual partners' (credit card and debit card companies') mandate(s) that it follow the requirements, Southwest acted willfully noncompliant with FACTA's truncation requirements.

46. Further, despite the law's initial enactment in 2003, it did not go into effect until December of 2006. In 2008, the Clarification Act extended the effective date of the FACTA payment card expiration date truncation requirements until June of 2008. Yet more than 9 years following its enactment, Southwest remained incompliant. Southwest systematically and routinely violated this law by electronically printing the expiration dates of its customers' payment cards on all payment card receipts generated as a result of purchases made at certain ticket counters in airports throughout the United States, and including San Diego's International airport, Lindbergh Field throughout the class period. Its interpretation of § 1681c(g)(1) – which resulted in it truncating payment card numbers, but electronically printing their expiration dates is objectively unreasonable.

47. As a result, Plaintiff and the Class members have been damaged in that Southwest has deprived Plaintiff and members of the class of a statutory right mandated by FACTA to receive receipts which have properly truncated their payment card information. As a result of Southwest's willful violation of the statute, Plaintiff and members of the Class are entitled to statutory damages in the amount of $100 to $1,000.00 per violation, punitive damages and attorneys' fees.

## CLASS ALLEGATIONS

48. Plaintiff brings this action on behalf of herself and all other similarly

situated consumers in the United States pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class:

> All customers who, within the applicable statute of limitations, made a purchase at a Southwest Airline ticket counter in the United States and received an electronically printed receipt at the point of sale which did not truncate the expiration date of the customers' payment card.

> Excluded from the Class are Southwest, its parents, subsidiaries, affiliates, officers and directors.

49.     ***Numerosity***.  The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Class contains thousands of customers who made a payment card purchase at a Southwest ticket counter and received an electronically printed receipt without a truncated expiration date; and were thereby damaged by Southwest's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

50.     ***Existence and Predominance of Common Questions of Law and Fact***.  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether Southwest electronically prints customer's receipts at the point of sale without truncating the expiration dates of their payment cards;

(b)     whether the alleged conduct violates FACTA § 1681 et seq;

(c)     whether Defendant's conduct was wifllful;

(d)     whether Plaintiff and Class members are entitled to statutory damages, punitive damages, costs and/or other appropriate remedies, including attorneys' fees.

51.     ***Typicality***.  Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all Class members had their rights violated through the

Case 3:13-cv-00429-JCS-BGS Document 31 Filed 02/17/13 Page 16 of 50

uniform misconduct described above, were subject to Southwest's violations of FACTA in the same manner and under identical circumstances (receiving an electronically printed receipt following the purchase of an airline ticket with a payment card at a Southwest ticket counter.) Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

52.    ***Adequacy of Representation***.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Class.

53.    ***Superiority***.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of its claims against Southwest. It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here..

54.    Unless a Class is certified, the class will not be fully compensated for Southwest's statutory violation(s) and will undoubtedly continue to engage in the illegal conduct.

55.    To the extent that any total award of statutory damages on a class-wide basis might be adjudicated as violating the Defendant's Due Process Rights under the

United States Constitution, Plaintiff, on behalf of the putative class, expressly requests only those damages fully allowable under the Constitution.

## COUNT I
### Violation of 15 U.S.C. § 1681c(g)(1)

56.     Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

57.     Plaintiff brings this claim individually and on behalf of the Class.

58.     15 U.S.C. §1681c(g)(1)  requires businesses to truncate credit and debit card numbers and suppress the printing of credit card and debit card expiration dates on electronically printed customer receipts at the point of sale as follows:

> "…[N]o person that accepts credit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.  *See* 15 U.S.C. § 1681c(g)(1).

59.     As described herein, Southwest continuously and systematically fails to comply with the requirements imposed on it *See* 15 U.S.C. § 1681c(g)(1) in the manner described herein.

60.     Southwest transacts business in the United States and accepts credit cards and/or debit cards for the payment of merchandise at its ticket counters in airports throughout the United States.

61.     In transacting its business, Southwest employs electronic cash registers, computers, and/or other machines that permit it to process credit card and debit card payments and transactions. At all times during the class period, its machines which process sales and payment card transactions at the point of sale electronically printed the class members' receipts without truncating their payment card expiration dates. At all times during the class period, Southwest was electronically printing its customers' payment card receipts at the point of sale without truncating the expiration dates of their customers'

Case 3:13-cv-01429-CRB Document 22-3 Filed 09/17/13 Page 18 of 50

payment cards in violation of 15 U.S.C. § 1681c(g)(1).

62. On May 3, 2012, Plaintiff engaged in a payment card purchase at a Southwest ticket counter in the San Diego airport, Linbergh Field, in San Diego, California. Upon the conclusion of her transaction at the point of sale, Southwest electronically printed her receipt which contained, among other things, the actual four (4) digit expiration date of her payment card.

63. As described herein, and all time during the class period, Southwest's actions with respect to the electronic printing of credit card and debit card receipts without truncating the expiration dates for the cards was a willful violation of 15 U.S.C. § 1681c(g)(1).

64. As described herein, despite repeated notice of FACTA's requirements, its apparent knowledge of the requirements, and its attempts to comply with FACTA's requirements, Southwest willfully violated FACTA in conscious disregard of the rights of Plaintiff and the members of the class thereby exposing Plaintiff and the members of the class to an increased risk of identity theft and or payment card fraud.

65. As a result of Defendant's willful violations of FACTA, Defendant is liable to Plaintiff and each member of the class in the statutory damage amount of "not less than $100 and not more than $1000" for each violation. 15 U.S.C. §1681n(a)(1)(A). Plaintiff and the members of the class are entitled to recover costs of suit and their reasonable attorneys' fees. 15 U.S.C. §1681n(a)(3). Also, Plaintiff and the members of the class are entitled to recover punitive damages. 15 U.S.C. §1681n(a)(2).

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment:

A. Certifying the Class as requested herein;

B. Awarding Plaintiff and the proposed Class members statutory damages in an

- 17 -

amount of "not less than $100 and not more than $1000" for each violation;

    C.    Awarding Plaintiff and the proposed Class members only an amount of damages permissible under the United States Constitution, in accordance with due process;

    D.    Awarding attorneys' fees and costs;

    E.    Awarding punitive damages according to proof; and

    F.    Providing such further relief as may be just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial of his claims by jury to the extent authorized by law.

DATED: February 12, 2013         **CARPENTER LAW GROUP**

                        _s/ Todd D. Carpenter_
                       Todd D. Carpenter
                       432 West Broadway, 29th Floor
                       San Diego, California 92101
                       Phone:      (619)347-3517
                       Facsimile:   (619) 756-6990
                       Todd@Carpenterlawyers.com

                       Attorneys for Plaintiff

JS 44 (Rev. 12/12)

Case 3:13-cv-01422-CRB Document 22-1 Filed 09/07/12 Page 20 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-1 Filed 02/12/13 Page 1 of 1

# CIVIL COVER SHEET

**13CV0342 JLS BGS**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jamie Lumos, on Behalf of Herself and All Others Similarly Situated | Southwest Airlines Co, a Texas Corporation and DOES 1 - 20 |

**(b)** County of Residence of First Listed Plaintiff    San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Dallas
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Carpenter Law Group, Phone: 619-347-3517
432 West Broadway, 29th Floor, San Diego, Ca 92101

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government    Plaintiff

☒ 3   Federal Question
     *(U.S. Government Not a Party)*

☐ 2   U.S. Government    Defendant

☒ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding    ☐ 2   Removed from State Court    ☐ 3   Remanded from Appellate Court    ☐ 4   Reinstated or Reopened    ☐ 5   Transferred from Another District *(specify)*    ☐ 6   Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. Sec 1332(d)(2)      15:1681 - Fair Credit Report Act (cxl)

Brief description of cause:
Violation of FACTA

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
5,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
02/12/2013

SIGNATURE OF ATTORNEY OF RECORD
s/ Todd D. Carpenter

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/11/13 Page 1 of 91



# Card Acceptance Guidelines
# for Visa Merchants



# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Section 1: Getting Down to Basics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Visa Transaction Processing—Who is Involved? . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Visa Transaction Flow for Magnetic-Stripe and Chip Cards . . . . . . . . . . . . . . . . 7

Visa Transaction Flow for PIN-Based Point-of-Sale and ATM . . . . . . . . . . . . . . . 9

Visa Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Visa Rules for Returns and Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Visa Rules for PIN-less Payment Brand Acceptance (U.S. Only) . . . . . . . . . . . . 18

**Section 2: Card-Present Transactions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Doing It Right at the Point of Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Visa Card Features and Security Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Authorization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Cardholder Verification and Identification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Suspicious Behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Skimming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Code 10 Calls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Recovered Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Visa payWave Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Visa Easy Payment Service Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Electron Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Visa Travelers Cheques . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Section 3: Card-Absent Transactions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

General Card-Absent Transaction Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fraud Prevention Guidelines for Card-Absent Transactions . . . . . . . . . . . . . . . 47

Additional Fraud Prevention Tools for the Internet . . . . . . . . . . . . . . . . . . . . . . 55

Suspicious Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Recurring Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

**Section 4: Payment Card Industry Data Security Standard and**

**PIN Security and Key Management** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Payment Card Industry Data Security Standard Requirements . . . . . . . . . . . . . 68

Visa PIN Security and Key Management Compliance Program . . . . . . . . . . . . . . 71

Merchant PIN Security and Key Management—

Essential Best Practices and Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Steps and Requirements for Compromised Entities . . . . . . . . . . . . . . . . . . . . . . . 74

**Appendix 1: Training Your Staff** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **77**

**Appendix 2: Glossary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **79**

**Appendix 3: Visa Europe Territory** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **87**

# Introduction

| | |
|---|---|
| **Purpose** | *The Card Acceptance Guidelines for Visa Merchants* is a comprehensive manual for all businesses that accept Visa transactions in the card-present and/or card-absent environment. The purpose of this guide is to provide merchants and their back-office sales staff with accurate, up-to-date information and best practices to help merchants process Visa transactions, understand Visa products and rules, and protect cardholder data while minimizing the risk of loss from fraud. |
| **Audience** | This book is targeted at both card-present and card-absent merchants and their employees outside of the jurisdiction of Visa Europe, which may have different practices and requirements. |
| **Contents** | *The Card Acceptance Guidelines for Visa Merchants* is organized to help users find the information they need quickly and easily. The table of contents serves as an index of the topics and material covered. |

Topics covered include:

✔ **Section 1: Getting Down to Basics—**An overview of how Visa transactions are processed, from point of transaction to clearing and settlement. A list of key Visa policies for merchants is also included.

✔ **Section 2: Card-Present Transactions—**Requirements and best practices for processing card-present transactions at the point-of-sale, including how to minimize key-entered transactions and ensure legible sales receipts. Suspicious transactions, Code 10 calls, and card recovery procedures are also discussed.

✔ **Section 3: Card-Absent Transactions—**Requirements and best practices for processing card-absent transactions including mail order, telephone order, and Internet sales. Visa fraud prevention tools, such as the Address Verification Service (AVS)**\*** and Card Verification Value 2 (CVV2)**\*\***; requirements for e-commerce websites; and procedures for recurring transactions are also covered.

✔ **Section 4: Payment Card Industry Data Security Standard and PIN Security and Key Management—**Comprehensive coverage of the Payment Card Industry and Data Security Standard (PCI DSS) requirements, with which all merchants and service providers must comply, to help ensure the security of confidential cardholder information. PCI PIN Security Requirements are also discussed.

✔ **Appendix 1: Training Your Staff** A reference to Visa.com which offers resources that merchants can use for training their employees on card acceptance and fraud prevention procedures.

✔ **Appendix 2: Glossary—**A list of terms used in the guide.

✔ **Appendix 3: Visa Europe Territory—**A list of Visa European Territories.

---

**\*** AVS is only available in the U.S. and Canada.

**\*\*** In certain markets, CVV2 is required to be present for all card-absent transactions.

Case 3:13-cv-01429-CRB Document 22-3 Filed 09/17/13 Page 25 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/11/13 Page 5 of 91

Introduction

Most of the information and best practices contained in this document pertain to all regions; however in some countries, there are specific products, services, and regulatory differences that must be noted. In these instances, country or region-specific details have been identified with a universally recognized icon for the country under discussion.

It is important to note that the Visa payment system is operated in European economic area by Visa Europe, a separate company operating under license from Visa Inc.

Participation in the Visa payment system in such countries is governed by the *Visa Europe Operating Regulations*, rather than the *Visa International Operating Regulations*. While the *Visa Europe Operating Regulations* share many core requirements to ensure interoperability, such rules and best practices may vary from the guidelines set forth in this document. Please see Appendix 3 for a list of countries within Visa Europe.

**The country icons are as follows:**

 United States

 Canada

 Latin America and Caribbean (LAC)

 Asia Pacific (AP)

 Central Europe, Middle East, and Africa (CEMEA)

Guide
Navigation

The *Card Acceptance Guidelines for Visa Merchants* provides icons that highlight additional resources or information:

| Icon: | Definition: |
| --- | --- |
| 🔍 | Additional insights related to the topic that is being covered. |
| VISA | A brief explanation of additional Visa resources that are pertinent to the topic at hand. |

© 2011 Visa. All Rights Reserved.

Case 3:13-cv-01429-CRB Document 22-3 Filed 09/27/13 Page 26 of 50
Case 3:13-cv-03429-JLS-BGS Document 1-2 Filed 02/11/13 Page 66 of 91

Introduction

## Disclaimer

The information in this guide is current as of the date of printing. However, card acceptance and processing procedures are subject to change. This guide contains information based on the current *Visa International Operating Regulations*. If there are any differences between the *Visa International Operating Regulations* and this guide, the *Visa International Operating Regulations* will prevail in every instance. Your merchant agreement and the *Visa International Operating Regulations* take precedence over this guide or any updates to its information. To access a copy of the *Visa International Operating Regulations*, visit *www.visa.com/merchant* and click on Operations and Procedures.

All rules discussed in this guide may not apply to all countries. Local laws and rules may exist and it is your responsibility to ensure your business complies with all applicable laws and regulations.

The information, recommendations or "best practices" contained in this guide are provided "AS IS" and intended for informational purposes only and should not be relied upon for operational, marketing, legal, technical, tax, financial or other advice. This guide does not provide legal advice, analysis or opinion. Your institution should consult its own legal counsel to ensure that any action taken based on the information in this guide is in full compliance with all applicable laws, regulations and other legal requirements.

Visa is not responsible for your use of the information contained in this guide (including errors, omissions, inaccuracy or non-timeliness of any kind) or any assumptions or conclusions you might draw from its use. Visa makes no warranty, express or implied, and explicitly disclaims the warranties of merchantability and fitness for a particular purpose, any warranty of non-infringement of any third party's intellectual property rights, any warranty that the information will meet your requirements, or any warranty that the information is updated and will be error free.

**For further information about the rules or practices covered in this guide, contact your acquirer.**

Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/11/13 Page 7 of 91

Introduction

© 2011 Visa. All Rights Reserved.

Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/11/13 Page 8 of 91

## Section 1    Getting Down to Basics

---

**What's Covered**

- Visa Transaction Processing—Who is Involved?
- Visa Transaction Flow for Magnetic-Stripe and Chip Cards
- Visa Transaction Flow for PIN-Based Point-of-Sale and ATM
- Visa Rules
- Visa Rules for Returns and Exchanges
- Visa Rules for PIN-less Payment Brand Acceptance

---

By accepting Visa cards at your point-of-sale, you become an integral part of the Visa payment system. That's why it's important that you start with a clear picture of the Visa card transaction process; what it is, how it works, and who's involved. The basic knowledge in this section provides you with a conceptual framework for the policies and procedures that you must follow as a Visa merchant. It will also help you to understand the major components of payment processing and how they affect the way you do business.

Case 3:13-cv-01429-CRB Document 22-3 Filed 09/27/13 Page 29 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/11/13 Page 9 of 91
Section 1: Getting Down to Basics

# Visa Transaction Processing—Who is Involved?

**Parties to Visa Transactions**

Besides you and your customers, several other parties are involved in every Visa transaction. The following summary will help you and your sales staff to better understand who does what.



**A cardholder** is an authorized user of Visa payment cards or other Visa payment products.



**A merchant** is any business entity that is authorized to accept Visa cards for the payment of goods and services.



**An acquirer** is a financial institution that contracts with merchants to accept Visa cards for payment of good and services. An acquirer may also contract with third party processors to provide processing services.



**A card issuer** is a financial institution that maintains the Visa cardholder relationship. It issues Visa cards and contracts with its cardholders for billing and payment of transactions.



**Visa Inc.** is a publicly-traded corporation that works with financial institutions that issue Visa cards (card issuers) and/or sign merchants to accept Visa cards for payment of goods and services (acquirers). Visa provides card products, promotes the Visa brand, and establishes the rules and regulations governing participation in Visa programs. Visa also operates the world's largest retail electronic payments network to facilitate the flow of transactions between acquirers and card issuers.



**VisaNet®** is part of Visa's retail electronic payment system. It is a collection of systems that includes:

- **An authorization service** through which card issuers can approve or decline individual Visa card transactions.

- **A clearing and settlement service** that processes transactions electronically between acquirers and card issuers to ensure that:

  – Visa transaction information moves from acquirers to card issuers for posting to cardholders' accounts.

  – Payment for Visa transactions moves from card issuers to acquirers to be credited to the merchant accounts.

Card Acceptance Guidelines for Visa Merchants
© 2011 Visa. All Rights Reserved.

# Visa Transaction Flow for Magnetic-Stripe and Chip Cards

The following illustrations show the life cycle of Visa card transactions for both card-present and card-absent purchases. **Processing events and activities may vary for any particular merchant, acquirer, or card issuer, depending on card and transaction type, and the processing system used.**

### Magnetic-Stripe and Chip Card—Credit or Debit Authorization

**Merchant** or cardholder swipes the card through a magnetic-card reader, dips the card into a chip-reading device,** or waves the card in front of a Visa payWave reader.

**Merchant** enters the transaction amount, and, if necessary, transmits an authorization request to the acquirer.*** *For card-absent transactions, the account number and other information may be digitally or key-entered.*

**Cardholder** presents a Visa card to pay for purchases. *For card-absent transactions, the cardholder provides the merchant with the account number, expiration date, billing address, and Card Verification Value 2 (CVV2).* *

**Acquirer** electronically sends the authorization request to VisaNet.

**VisaNet** passes on the request to the card issuer.





*For chip card transactions, the card and chip-reading device work together to determine the appropriate cardholder verification method (either signature, PIN, or Visa Easy Payment Service).*

*If the transaction requires a PIN-verification, the cardholder follows POS prompts and enters the PIN.*

**Card issuer** provides an online response.

**Merchant** receives the authorization response, and completes the transaction accordingly.

**Acquirer** forwards the response to the merchant.

**VisaNet** forwards the card issuer's authorization response to the acquirer.

*Before approving a transaction, the issuer may check to make sure the cardholder has available funds for credit, then:*

- *Checks the exception file for all "statused" accounts such as lost, stolen, counterfeit, and credit problems.*
- *Applies risk-based rules or parameters, such as velocity checks, or a neural network to minimize fraudulent transactions.*

*If a match is made, the transaction is declined and a response is given to the merchant which could include instructions to retain the card.*

\* In certain markets, CVV2 is required to be present for all card-absent transactions.

\*\* Many Visa cards have a chip that communicates information to a POS terminal with a chip-reading device. If a chip reading device is available, preference must always be given to chip card processing before attempting to swipe the stripe.

\*\*\* In some markets, chip and Visa payWave allow for chip-based offline authorization.

Case 3:13-cv-01429-GPB Document 22-2 Filed 09/17/13 Page 31 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 11 of 91

Section 1: Getting Down to Basics

## Magnetic-Stripe and Chip Card—Clearing and Settlement

**Acquirer** credits the merchant's account and electronically submits the transaction to Visa for settlement.

**Merchant** deposits the transaction receipt with acquirer.*






**VisaNet:**

- Facilitates settlement.
- Pays the acquirer and obtains settlement from the card issuer then sends the transaction to the card issuer.

**Card issuer:**

- Posts the transaction to the cardholder account.
- Sends the monthly statement to the cardholder.

**Cardholder** receives the statement.

---

* Merchants or their Third Party Agents that store, process, or transmit account information may not store sensitive authentication data (full magnetic-stripe or chip), Card Verification Value 2 (CVV2), data, or PIN Verification Value (PVV) data—even if it is encrypted. Once an authorization is processed, such data should no longer exist. The only components of the magnetic stripe or chip that can be stored are the cardholder's name, personal account number (PAN), and expiration date. This information can only be stored if encrypted, suppressed, or masked—as to render it useless in the event of a data breach in compliance with the Payment Card Industry Data Security Standard (PCI DSS).

© 2011 Visa. All Rights Reserved.

Section 1: Getting Down to Basics

## Visa Transaction Flow for PIN-Based Point-of-Sale and ATM

PIN-based point-of-sale or ATM transactions are typically authorized and cleared (posted) at the same time within a single message. Settlement occurs from this single message at certain cut-off times during the day. This is referred to as an "online" debit transaction. The following diagrams illustrate the basic processing steps for PIN-based point-of-sale (Interlink) and ATM (Visa/Plus) transactions.

### Interlink Authorization, Clearing and Settlement

**Merchant** or cardholder swipes the card through a magnetic-card reader, dips the card into a chip-reading device,* or waves the card in front of a Visa payWave reader. The merchant then enters the transaction amount. The cardholder enters the PIN. A transaction authorization request is transmitted to the acquirer.

**Acquirer gateway** or acquirer back office determines the network to which the transaction should be routed.

For **Interlink**, the acquirer gateway or acquirer back office electronically sends the authorization request to VisaNet. All other transactions are transmitted to the appropriate network.

**Other networks**



**Cardholder** presents a card to pay for purchases.

**VisaNet**
- Passes on the request to the card issuer.
- Facilitates settlement.

**Card issuer**
- Provides an online response.
- Posts the transaction to the cardholder account.

**Merchant** receives the authorization response and completes the transaction accordingly.

**Acquirer** forwards the response to the merchant.

**VisaNet** forwards the card issuer's authorization response to the acquirer.

*Before approving a transaction, the issuer may check to make sure the cardholder has available funds or credit, then:*
- *Checks for all "statused" accounts such as lost, stolen, and counterfeit.*
- *Validates the PIN.*

---

**\*** Many Visa cards have a chip that communicates information to a point-of-sale terminal with a chip-reading device. If a chip reading device is available, preference must always be given to chip card processing before attempting to swipe the stripe.

Case 3:13-cv-01429-CRB Document 22-3 Filed 09/17/13 Page 33 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 19 of 91

Section 1: Getting Down to Basics

## Visa/Plus Authorization, Clearing and Settlement

 The ATM acquiring bank routes the cash withdrawal authorization request based on ATM network processing preferences.

**Other networks**

**Cardholder** presents Visa card at ATM, enters PIN, and makes cash withdrawal request.



  

**Visa/Plus Network**

*On-Us (Acquirer is also the card issuer)*

**Visa/Plus**

- Passes on the request to the card issuer.
- Facilitates settlement.



**ATM** dispenses cash to cardholder.

 

**Visa/Plus** forwards the card issuer's response to the ATM acquiring bank.

**Card issuer**

- Provides an online response.
- Posts the transaction to the cardholder account.

*Before approving a transaction, the issuer may check to make sure the cardholder has available funds, then:*

- *Checks for all "statused" accounts such as lost, stolen and counterfeit.*
- *Validates the PIN.*

Card Acceptance Guidelines for Visa Merchants
© 2011 Visa. All Rights Reserved.

Section 1: Getting Down to Basics

# Visa Rules

Merchants must follow basic card acceptance rules for all Visa transactions. Careful and consistent adherence to the Visa rules outlined in this section will help you to enhance customer satisfaction and operate your business efficiently. If you have any questions about any of the Visa rules presented here, contact your acquirer.

**Taxes**

**Include tax in the total transaction amount**. Any tax that you are required to collect must be included in the total transaction amount. Never collect taxes separately in cash.

**Card Acceptance**

**Accept all types of valid Visa cards. Although Visa card acceptance rules may vary based on country specific requirements or local regulations, to offer the broadest possible range of payment options to cardholder customers, most merchants choose to accept all categories of Visa debit, credit, and prepaid cards.\***

**Minimum/ Maximum Purchase**



**Check with your acquirer regarding the minimum purchase amount that you are allowed to charge.** U.S. merchants may establish a minimum purchase amount on credit card transactions. The minimum purchase amount must not exceed $10, must not differentiate between card issuers or card brand, and does not apply to transactions made with a debit card.

 **Adhere to any maximum purchase amounts on credit card transactions established by federal agencies or institutions of higher education.** The maximum purchase amount must not differentiate between card issuers or card brand, and does not apply to transactions made with a debit card.

 **In other countries, there are multiple variations of the "Minimum Purchase" rule, depending on local law and acquiring practices.** Your acquirer can advise you regarding permissible minimum purchase amounts.

**No Surcharging**

**Always treat Visa transactions like any other transaction.** You must not impose any surcharge\*\* on a Visa transaction.

**Prohibited Uses**

**Never use the Visa card/account number to refinance existing debts or as a payment for a debt deemed as uncollectible (i.e., recover funds for a dishonored check).**

**Quick Tip**



When prominently displayed, Visa decals and point-of-sale signage are helpful tools for encouraging your customers to use their Visa cards to pay.

---

**\*** Visa debit and credit cards may have different acceptance policies if you are located in the U.S., Australia, or Canada.

**\*\*** There are certain variations of the "No Surcharging" rule, depending on local law and acquiring practices. Check with your acquirer regarding prohibited surcharges and/or discounts.

Case 3:13-cv-01429-GPC-BGS Document 22-8 Filed 09/17/13 Page 35 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 19 of 91

Section 1: Getting Down to Basics

## Convenience Fees*



**For merchants who offer an alternate payment channel (i.e., mail, telephone, or e-commerce) for customers to pay for goods or services, a convenience fee may be added to the transaction amount.** If the merchant chooses to assess a convenience fee to its customers, the merchant **must** adhere to Visa rules regarding convenience fees.

*For further information on Convenience Fees, please contact your acquirer.*

## Laundering

**Deposit transactions only for your own business.** Depositing transactions for a business that does not have a valid merchant agreement is called laundering. Laundering is not allowed; it is a form of fraud associated with high chargeback rates and the potential for accommodating illegal activity.

## Zero-Percent Tip



**For restaurant, taxicab, limousine, bar, tavern, beauty/barber shop, and health/beauty spa merchant transactions with a Visa credit or debit card, authorize only for the known amount, not the transaction amount plus estimated tip.** Cardholders now have the ability to check their credit or checking accounts almost instantaneously via phone, the Internet, or an ATM. An authorization that includes an estimated tip can reduce a cardholder's available funds or credit by an unrecognizable or unexpected amount. This kind of transaction may occur if a cardholder leaves a cash tip or adds a tip that is less than the estimated amount used for authorization. For example, a restaurant authorizes for an estimated 20 percent tip, but the customer adds on only 15 percent.

**If the exact amount of the tip is known at the time of authorization, then it should be included in the authorization amount. This is common for chip and PIN transactions.**



> Restaurant, taxicab, limousine, bar, tavern, beauty/barber shop, and health/beauty spa authorizations are valid for the transaction amount plus or minus 20 percent to protect merchants from chargeback liability for failure to obtain proper authorization.



> Restaurants are permitted and protected from chargeback for failure to obtain proper authorization if they clear for an amount up to 20 percent more than they authorized, and the same is true up to 15 percent additional for T&E merchants.

**For further information on zero-percent tip authorization, contact your acquirer.**

---

**\*** Visa Convenience Fees are permitted only under certain circumstances in the U.S., CEMEA, and Asia Pacific.

© 2011 Visa. All Rights Reserved.

Case 3:13-cv-01429-GPC-BGS Document 22-8 Filed 09/17/13 Page 36 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 16 of 91

Section 1: Getting Down to Basics

| | |
|---|---|
| **No Cash Refunds** | **Complete a Visa credit receipt for merchandise returns or adjustments. Do not provide cash refunds for returned merchandise originally purchased with a Visa card.** Visa does not permit cash refunds for any credit or debit card transaction. By issuing credits, you protect your customers from individuals who might fraudulently make a purchase on their Visa account and then return the merchandise for cash. |
| | If a transaction was conducted with a Visa prepaid card and the cardholder is returning items but has discarded this card, you may give a cash refund or in-store credit. |
| **Deposit Time Limits** | **Deposit your Visa transaction receipt as specified by your acquirer.** Generally, transaction receipts must be deposited within three business days of the transaction date, with some exceptions. The sooner you deposit transaction receipts with your acquirer, the sooner you get paid. Transactions deposited more than 30 days after the original transaction date may be charged back to you. For card-absent transactions, the transaction date is the merchandise **ship date**, not the order date. |
| **Suppressed Account Number and Expiration Date** | **Ensure that the Visa account number is suppressed in accordance with Visa rules and local laws and regulations.** Visa recommends that all but the last four digits of the account number be suppressed on the cardholder copy of the transaction receipt, unless otherwise required under local law. |
| | The expiration date should not appear at all on the cardholder copy of the transaction receipt. Existing point-of-sale terminals must comply with these requirements. To ensure that your point-of-sale terminals are properly set up for account number and expiration date suppression, contact your acquirer. |
| **Delivery of Goods and Services** | **Deliver the merchandise or services to the cardholder at the time of the transaction.** Cardholders expect immediate delivery of goods and services unless other delivery arrangements have been made. For card-absent transactions, cardholders should be informed of delivery method and tentative delivery date. Transactions cannot be deposited until goods or services have been shipped. |
| **Delayed Delivery** | **For a delayed delivery, obtain where applicable two authorizations: one for the deposit amount and one for the balance amount.** Some merchandise, such as a custom-covered sofa, requires delivery after the transaction date. In these delayed-delivery situations, the customer pays a deposit at the time of the transaction and agrees to pay the balance upon delivery of the merchandise or services. |

Case 3:13-cv-01429-GPC-BGS Document 22-8 Filed 09/17/13 Page 37 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 17 of 91

Section 1: Getting Down to Basics

To complete a delayed-delivery transaction, you should where applicable:

- **Create two transaction receipts**, one for the deposit and one for the balance. Write, print out, or stamp "Deposit" or "Balance," as appropriate, on the receipt.

- **Obtain an authorization** for each transaction receipt on their respective transaction dates. Ensure an authorization code is on each receipt; if your point-of-sale device does not automatically print authorization codes on sales receipts, write the codes on the receipts so they are clearly identifiable as such.

- **Ensure that "Delayed Delivery,"** is written, printed, or stamped along with the authorization code, on each transaction receipt.

You may deposit the deposit portion of the transaction before delivery of the goods or services. However, you must **not** deposit the balance portion of the transaction prior to delivery.

## Installment Payments



An installment payment* is a functionality of the credit card. It allows a cardholder to pay the full amount of the transaction in installments. This can be accomplished through interest-bearing financing (granted by the card issuer), allowing the merchant to be paid in one lump sum, or with interest-free financing (granted by the merchant).

## Cardholder Information

**Keep cardholder account numbers and personal information confidential.** Cardholders **expect** you to safeguard any personal or financial information they may give you in the course of a transaction. Keeping that trust is essential to fraud reduction and good customer service. Cardholder account numbers and other personal information should be released only to your acquirer or processor, or as specifically required by law.



> For more information on Visa's data security requirements and programs, see *Section 4, Payment Card Industry Data Security Standard and PIN Security and Key Management*.

---

**\*** Installment payments apply only in Asia Pacific and Latin America.

Section 1: Getting Down to Basics

**Merchant Servicer Registration**

**Merchants and their Visa acquirers must ensure that Third Party Agents who are handling Visa account numbers are registered in accordance with the *Visa International Operating Regulations*.** A merchant servicer (MS) is defined by Visa as a Third Party Agent that has a direct relationship with a merchant and is storing, processing or transmitting Visa account numbers on the merchants' behalf. This type of Third Party Agent performs services such as payment gateway, shopping cart, fraud scrubbing, loyalty programs, etc. Merchants and their Visa acquirers are responsible for ensuring each MS maintains compliance with the Payment Card Industry (PCI) Data Security Standard (DSS), validates PCI DSS compliance with Visa, and is correctly registered as a MS with Visa.

Merchants should work with their Visa acquirers to ensure all Third Party Agent rules and requirements have been satisfied, ensuring the merchants compliance with *Visa International Operating Regulations*.

Any Third Party Agent that is used by a merchant must be validated for PCI DSS compliance and listed on Visa's validated service providers list. The global list of PCI DSS Validated Service Providers is located on *www.visa.com/cisp*.



For more information on Visa's data security requirements and programs, see *Section 4, Payment Card Industry Data Security Standard and PIN Security and Key Management*.

**Sensitive Data Storage and Payment Application Use**

All stored, processed or transmitted sensitive cardholder account or transaction information must comply with the PCI DSS and the *Visa International Operating Regulations*. To protect sensitive customer and transaction information from compromise merchants that store, process, or transmit cardholder account or transaction data must:

- Keep all material containing account numbers—whether on paper or electronically—in a secure area accessible to only selected personnel. Merchants with paper receipts should be extremely careful during the storage or transfer of this sensitive information. Merchants should at all times:
  - Promptly provide the drafts to their acquirer.
  - Destroy all copies of the drafts that are not delivered to the acquirer.
- Render cardholder data unreadable, both in storage and prior to discarding.
- Never retain full-track, magnetic-stripe, CVV2**\***, and chip data subsequent to transaction authorization. Storage of track data elements in excess of name, personal account number (PAN), and expiration date after transaction authorization is strictly prohibited.
- Use payment applications that comply with the PCI Payment Application Data Security Standard (PA-DSS). A list of validated payment applications is available at *www.pcissc.org*.

---

**\*** In certain markets, CVV2 is required to be present for all card-absent transactions.

Section 1: Getting Down to Basics

# Visa Rules for Returns and Exchanges

As a merchant, you are responsible for establishing your merchandise return and adjustment (credit) policies. Clear disclosure of these policies can help you avoid misunderstandings and potential cardholder disputes. Visa will support your policies, provided they are clearly disclosed to cardholders **before** the completion of a transaction.

If you are unsure how to disclose your return and adjustment policies, contact your acquirer for further guidance.

**Disclosure for Card-Present Merchants**

For card-present transactions, Visa will accept that proper disclosure has occurred before a transaction is completed if the following (or similar) disclosure statements are legibly printed on the face of the transaction receipt near the cardholder signature line.

| Disclosure Statement | What It Means |
|---|---|
| **No Refunds or Returns or Exchanges** | Your establishment does not issue refunds and does not accept returned merchandise or merchandise exchanges. |
| **Exchange Only** | Your establishment is willing to exchange returned merchandise for similar merchandise that is equal in price to the amount of the original transaction. |
| **In-Store Credit Only** | Your establishment takes returned merchandise and gives the cardholder an in-store credit for the value of the returned merchandise. |
| **Special Circumstances** | You and the cardholder have agreed to special terms (such as late delivery charges or restocking fees). The agreed-upon terms must be written on the transaction receipt or a related document (e.g., an invoice). The cardholder's signature on the receipt or invoice indicates acceptance of the agreed-upon terms. |
| **Timeshare** | You must provide a full credit when a transaction receipt has been processed and the cardholder has cancelled the transaction within 10 calendar days of the transaction date. |

© 2011 Visa. All Rights Reserved.

Case 3:13-cv-01429-CRB  Document 22-8  Filed 09/17/13  Page 40 of 50
Case 3:13-cv-00342-JLS-BGS  Document 1-2  Filed 02/12/13  Page 20 of 91

Section 1: Getting Down to Basics

Disclosure for
Card-Absent
Merchants

**Mail Order**

For proper disclosure, your refund and credit policies may be mailed, e-mailed, or faxed to the cardholder. To complete the sale, the cardholder should sign and return the disclosure statement to you.

**Internet**

Your website must communicate its refund policy to the cardholder and require the cardholder to select a "click-to-accept" or other affirmative button to acknowledge the policy. The terms and conditions of the purchase must be displayed on the same screen view as the checkout screen that presents the total purchase amount, or within the sequence of website pages the cardholder accesses during the checkout process.

Case 3:13-cv-01429-GRB Document 22-8 Filed 09/17/13 Page 41 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 21 of 91

Section 1: Getting Down to Basics

# Visa Rules for PIN-less Payment Brand Acceptance ( 🇺🇸 U.S. Only)

Merchants need to understand and follow Visa payment acceptance rules if they elect to implement a PIN-less payment option for debit cards. To this end, you are encouraged to work closely with your acquirer to ensure that the following practices are adopted prior to system implementation.

**Three Important Steps**

### 1. Offer the Customer a Clear Payment Choice

Confusion often arises when customers believe they're paying using one payment brand, but the transaction is processed using another brand. For example, a customer who selects payment by Visa should always have that choice honored. Options such as *"Debit"* and *"Credit"* may have different meanings depending upon the customer's understanding. Selection of a payment brand provides a clearer choice to the consumer. This is why it is best for merchants to provide their customers with a menu of acceptable brands.

- **For Internet merchants**, providing a menu or radio button that presents all of the payment brand options allows the customer to make an informed choice (as shown in the example to the right).



**Billing Information**

- **For telephone merchants** who instruct customers to select their preferred payment method through a Voice Response Unit (VRU) or customer service agent, identify specific payment brand options, and allow the customer to make an informed choice. Don't use generic terms, such as credit, debit and ATM.

- **For card-present merchants**, a similar payment choice option must be provided to the cardholder by the merchant.

### 2. Honor the Choice

If the customer indicates that he or she wants to pay with a Visa card, the merchant must make sure that choice is honored. A merchant is allowed to steer the customer to other forms of payment, but cannot confuse or mislead the customer or omit important information in the process. In other words, the choice is ultimately the customer's. A transaction can only be processed as something other than Visa if the customer has expressly selected another form of payment. However, if a customer chooses Visa, it must be processed as a Visa transaction.

### 3. Confirm the Choice

To avoid any kind of misunderstanding about the customer's choice of payment, merchants should include a confirmation page or voice confirmation that specifies the payment option selected (e.g., Visa, MasterCard, Star).

18

Case 3:13-cv-01429-GPC-BGS Document 22-3 Filed 09/17/13 Page 42 of 50

## Section 2    Card-Present Transactions

> **What's Covered**
>
> - Doing It Right at the Point of Sale
> - Visa Card Features and Security Elements
> - Authorization
> - Cardholder Verification and Identification
> - Suspicious Behavior
> - Skimming
> - Code 10 Calls
> - Recovered Cards
> - Visa payWave Transactions
> - Visa Easy Payment Service Transactions
> - Electron Cards
> - Visa Travelers Cheques

Card-present transactions are those in which both the card and cardholder are present at the point of sale. Merchants associated with this sales environment include traditional retail outlets such as department and grocery stores, electronics stores, and specialty shops and boutiques. Gas stations and other businesses where customers may use unattended payment devices are also defined as card-present merchants.

In traditional sales environments, merchants are required to take all reasonable steps to assure that the card, cardholder, and transaction are legitimate. Proper card acceptance begins and ends with sales staff and is critical to customer satisfaction and profitability.

# Doing It Right at the Point of Sale

Whether sales associates are experienced or new to the job, if they follow a few basic card acceptance procedures, they will do it right the first time and every time.

The following illustrations provide an overview of the card acceptance steps that should be followed at a point-of-sale terminal. Each step is explained in greater detail in this section.

### Illustration of Card Acceptance (Magnetic Stripe Card Processing)

Swipe the card through a magnetic card reader or wave the card in front of a Visa payWave contactless reader to request the transaction authorization.

While the transaction is being processed, check the card's features and security elements, if possible. Make sure the card is valid and has not been altered in any way.



Obtain authorization and, if required, get the cardholder signature* on the transaction receipt.

Compare the name, number, and signature* on the card to those on the transaction receipt.

If you suspect fraud, make a Code 10 call.

 For more information about making a Code 10 call, please refer to page 37 in this guide.

---

\* The cardholder signature is **not** required if the transaction is PIN-Verified, processed with Visa Easy Pay Service (VEPS), or with some Visa payWave transactions.

© 2011 Visa. All Rights Reserved.

Section 2: Card-Present Transactions

### Illustration of Card Acceptance (Chip Card Processing)

In simple terms, a chip card is a plastic payment card with an embedded computer chip containing a microcomputer, analogous to a personal computer with memory. Chip cards offer a variety of benefits such as:

- Extremely difficult to copy
- Facilitates the evolution of security methods and processes
- Capability of holding many applications
- Keeps and updates large amounts of data
- Enhanced options to support PIN
- Performs calculations and makes decisions
- Enhances confidence in the payments system



The card and chip-reading device work together to determine the appropriate cardholder or verification method for the transaction either signature, PIN, or Visa EasyPay Service (VEPS).

If the transaction requires a PIN-verification, the cardholder follows point-of-sale prompts and enters the PIN. There is no opportunity to examine the card. It is retrieved by the cardholder.

Dip the card into a chip-reading device* or wave the card in front of a Visa payWave reader to request the transaction authorization.

If you suspect fraud, make a Code 10 call.**

If the transaction has been PIN-verified, there is no need for signature.

The merchant prints a copy of transaction receipt for cardholder. If the transaction is not PIN-based, the receipt will have a signature line. The merchant must ask the cardholder to sign the receipt.

---

\* Many Visa cards have a chip that communicates information to a point-of-sale terminal with a chip-reading device. If a chip-reading device is available, preference must always be given to chip card processing before attempting to swipe the stripe. The card should remain in the terminal until the transaction is complete.

\*\* Some chip-reading devices support a "merchant suspicious" indicator on the authorization.

Case 3:13-cv-01429-GPC-BGS Document 22-8 Filed 09/17/13 Page 45 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 29 of 91

Section 2: Card-Present Transactions

**It Pays to Swipe the Stripe**

On the back of every Visa card, you'll find a magnetic stripe. It contains the cardholder's name, card account number, and expiration date, as well as special security information designed to help detect counterfeit cards. When the stripe is swiped through the terminal, this information is electronically read and relayed to the card issuer, who then uses it as crucial input for the authorization decision.

**Always Dip the Chip**

When the Visa card that is being presented has a chip and the merchant has a point-of-sale terminal with a chip-reading device, follow these steps.

- **Insert the chip card into the chip-reading device.\***

    – Make sure your staff or the cardholder inserts the card into the chip-reading device. If the card is swiped first, the terminal will read the service code and prompt you to insert the card into the chip-reading device.

    – Follow the picture or diagram displayed on the terminal screen that shows which way the chip should face.

    – Keep the card inserted in the chip-reading device during the entire transaction (do not swipe the card unless the terminal screen instructs you to).

    – Do not remove the card until you are instructed to do so by the chip-reading device.

- **Follow the instructions on the terminal screen.** The chip-reading device compares the applications it supports to the applications available on the card, then displays instructions on how to proceed.

    – If the card and chip-reading device have one application in common, that application is automatically used.

    – If the card and chip-reading device have more than one application in common, the terminal screen may display a list of applications to the cardholder.

    – If the chip-reading device cannot read the chip on the card, it means the card and chip-reading device have no applications in common. In this case, you should follow "fallback" requirements and accept the chip card via standard magnetic stripe transaction processing as prompted on the terminal screen.



> Fallback refers to the action taken by a merchant to allow chip cards to be processed via magnetic stripe or key entry at chip-enabled terminals if the terminal fails to read the chip. Because the fallback transaction is swiped or keyed, the normal rules of transaction processing for magnetic stripe or key entry, as applicable, will come into play meaning that a signature will be required, rather than a PIN and, for key-entered transactions, manual imprints will be required. Merchants should not force a fallback transaction. Merchants are more likely to see declines for fallback transactions, than for a valid chip card transaction.

- **Always make sure that the chip-reading device is easily accessible to the cardholder.**

---

**\*** Many Visa cards have a chip that communicates information to a point-of-sale terminal with a chip-reading device. If a chip-reading device is available, preference must always be given to chip card processing before attempting to swipe the stripe. The card should remain in the terminal until the transaction is complete.

© 2011 Visa. All Rights Reserved.

Case 3:13-cv-01429-GBC Document 22-3 Filed 09/17/13 Page 46 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 20 of 91

Section 2: Card-Present Transactions

## If a Card Won't Read When Swiped

In some instances, when you swipe a card, the terminal will not be able to read the magnetic stripe or perform an authorization. When this occurs, it usually means one of four things:

- The terminal's magnetic-stripe reader is not working properly.
- The card is not being swiped through the reader correctly.
- You may have a counterfeit or altered payment card.
- The magnetic stripe on the card has been damaged or demagnetized. *Damage to the card may happen accidentally, but it may also be a sign that the card is counterfeit or has been altered.*

If a card won't read when swiped, you should:

- Check the terminal to make sure that it is working properly and that you are swiping the card correctly.
- If the terminal is okay, take a look at the card's security features to make sure the card is not counterfeit or has not been altered in any way (see *Visa Card Features and Security Elements* on page 25 in this section.)
- If the problem appears to be with the magnetic stripe, follow store procedures. You may be allowed to use the terminal's manual override feature to key-enter transaction data for authorization, or you may need to make a call to your voice-authorization center.
- For key-entered or voice-authorized transactions, make an imprint of the front of the card. The imprint proves the card was present at the point-of-sale and can protect your business from potential chargebacks if the transaction turns out to be fraudulent. The imprint can be made either on the sales receipt generated by the terminal or on a separate manual sales receipt form signed by the customer.
- If an unembossed card will not swipe, you should ask for another form of payment. Do not manually key enter unembossed cards, or write the account number on a paper draft. A marked paper draft will not protect merchant against chargeback.



> For some merchants, a high key entry rate is due to misclassification of card-absent transactions so they look like card-present transactions. Consult with your acquirer to make sure your card-absent transactions are correctly classified with accurate MO/TO and ECI indicators.

## If the Terminal Cannot Read the Chip

When normal chip transactions cannot be processed at chip terminals, the merchant "falls back" to lesser method. Because the fallback transaction is swiped or keyed, the normal rules of transaction processing for magnetic stripe or key entry as applicable will come into play. This means that a signature will be required, rather than a PIN. For key-entered transactions, manual imprints will be required.

Case 3:13-cv-01429-GPC-BGS Document 22-8 Filed 09/17/13 Page 47 of 50
Case 3:11-cv-00342-LS-BGS Document 1-2 Filed 02/17/13 Page 27 of 91

Section 2: Card-Present Transactions

<table>
<tr><td>

**How to Minimize Key-Entered Transactions**

</td><td>

These best practices can help you keep key-entered transactions at acceptably low levels and should be incorporated into your daily operations and staff training and review sessions.

</td></tr>
</table>

### Pinpoint Areas with High Key-Entry Fallback Rates

Calculate the percentage of key-entered transactions compared to total transactions to pinpoint which stores, terminals, or sales associates have high key-entry rates. Merchants are encouraged to monitor their key-entry rates on a monthly basis.

To obtain the percentage of key-entered transactions for a particular terminal, divide the total number of key-entered transactions by the total number of sales. Exclude from both totals any mail or telephone orders that may have been made at the terminal. Perform the above calculation for each terminal and for each sales shift to determine the key-entry rate per sales associate. Repeat the process for each store, as appropriate.

### Find Causes and Look for Solutions

If your key-entry or fallback rates are greater than one percent per terminal or sales associate, you should investigate the situation and try to find out why. The following chart summarizes the most common reasons for high key-entry rates and provides possible solutions.

| Key-Entry Cause | Solution |
|---|---|
| **Damaged Magnetic-Stripe Readers or Chip-Reading Device** | Check magnetic-stripe readers or chip-reading devices regularly to make sure they are working. |
| **Dirty Magnetic-Stripe Readers or Chip-Reading Device** | Clean magnetic-stripe reader or chip reading device heads several times a year to ensure continued good use. Follow the cleaning instructions supplied with the terminal. |
| **Magnetic-Stripe Reader or Chip-Reading Device Obstructions** | Remove obstructions near the magnetic-stripe reader or chip-reading device. Electric cords or other equipment could prevent a card from being swiped straight through the reader in one easy movement. |
| **Spilled Food or Drink** | Remove any food or beverages near the magnetic-stripe reader or chip-reading device. Falling crumbs or an unexpected spill could soil or damage the machine. |
| **Anti-Theft Devices that Damage Magnetic Stripes** | Keep magnetic anti-theft deactivation devices away from any counter area where customers might place their cards. These devices can erase a card's magnetic stripe. |
| **Improper Card Swiping** | • Swipe the card in one quick, smooth motion.<br>• Never swipe a card back and forth.<br>• Never swipe a card at an angle. This may cause a faulty reading. |
| **Improper Card Dipping** | • Dip the card in one quick, smooth motion.<br>• Never dip a card in and out.<br>• Never dip a card at an angle: Leave the chip card in the reading device until instructed to remove it. |

© 2011 Visa. All Rights Reserved.

Case 3:13-cv-01429-GPB Document 22-3 Filed 09/17/13 Page 48 of 50
Case 3:13-cv-00342-JLS-BGS Document 1-2 Filed 02/12/13 Page 29 of 91

Section 2: Card-Present Transactions

# Visa Card Features and Security Elements

Every Visa card contains a set of unique design features and security elements developed by Visa to help merchants verify a card's legitimacy. By knowing what to look for on a Visa card, your sales associates can avoid inadvertently accepting a counterfeit card or processing a fraudulent transaction.

Train your sales staff to take a few seconds to look at the card's basic features and security elements after they have swiped the card and are waiting for authorization. Checking card features and security elements helps to ensure that the card is valid and has not been altered in any way.

## What to Look for on all Visa Cards

### Visa Brand Mark Card Security Features

The **Signature Panel** must appear on the back of the card and contain an ultraviolet element that repeats the word "Visa®." The panel will look like this one, or have a custom design. It may vary in length.

The words "Authorized Signature" and "Not Valid Unless Signed" must appear above, below, or beside the signature panel.

If someone has tried to erase the signature panel, the word 'VOID' will be displayed.

**Card Verification Value (CVV)** is a unique three-digit code that is encoded on the magnetic stripe of all valid cards. CVV is used to detect a counterfeit card.

The **Magnetic Stripe** is encoded with the card's identifying information.

**Card Verification Value 2 (CVV2)** * is a three-digit code that appears either in a white box to the right of the signature panel, or in a white box within the signature panel. Portions of the account number may also be present on the signature panel. CVV2 is used primarily in card-absent transactions to verify that customer is in possession of a valid Visa card at the time of the sale.

The **Mini-Dove Design Hologram** may appear on the back anywhere within the outlined areas shown here. The three-dimensional dove hologram should appear to move as you tilt the card.



**Embossed/Unembossed or Printed Account Number** on valid cards begins with "4." All digits must be even, straight, and the same size.

**Four-Digit Bank Identification Number (BIN)** must be printed directly below the account number. This number must match exactly with the first four digits of the account number.

**Cardholder Name or a Generic Title** may be embossed or printed on the card. This field may be blank on some Visa cards.

**Expiration** or **"Good Thru"** date should appear below the account number.

**Ultraviolet "V"** is visible over the Visa Brand Mark when placed under an ultraviolet light.

**Visa Brand Mark** must appear in blue and gold on a white background in either the bottom right, top left, or top right corner.

If you do not see a mini-dove on the back of the card, check for the traditional dove hologram above the Visa Brand Mark on the front of the card.

**Flying Dove Hologram**

* In certain markets, CVV2 is required to be present for all card-absent transactions.

Section 2: Card-Present Transactions

## Alternative Visa Brand Mark Applications



The two-color Visa Brand Mark (as shown here) does not have the standardized white background.



The two-color reverse Visa Brand Mark (as shown here) does not have the standardized white background and has been reversed to white with a gold wing within the letter form of the V.

The Visa Brand Mark can appear in the upper left, upper right, and the lower right corner location on the front of the card.
**Note:** Upper left placement allowed only on cards with a chip.

## Visa Mini-Card



A Visa Mini Card is a miniature version of a standard size Visa Card or Visa Electron Card.

## Visa Vertical Card



This card has a vertical orientation and account information is laser printed on the card, not embossed. It includes a magnetic stripe just like its embossed counterpart, and a card verification code on the back.

© 2011 Visa. All Rights Reserved.

Section 2: Card-Present Transactions

## Unembossed Visa Card Acceptance

**The unembossed Visa card (e.g., prepaid card) may look and feel different**, but it is a valid card that can be accepted at any Visa merchant location that has an electronic terminal. Unlike an embossed Visa card with raised numbers, letters, and symbols, the unembossed card has a smooth, flat surface. From a merchant perspective, the processing of an unembossed card at the point-of-sale should be seamless. There's no need for new software, special hardware, or modified terminal procedures. You simply swipe the unembossed card just as you would an embossed card, then wait for an authorization and obtain the cardholder's signature. Because of the unembossed card's flat surface, it cannot be used for transactions that require a card manual imprint. Merchant should not attempt to hand-write receipts or key-enter the account number for unembossed cards.



**Full Magnetic-Stripe Data** must be transmitted as part of the unembossed Visa card transaction authorization. Merchants are required to swipe an unembossed card through the terminal to prove that the card was present at the time of the transaction.

**Unembossed 16-digit Account Number, Cardholder Name, and Expiration Date** are laser-engraved, thermal or indent-printed securely on the front of the card. The card's flat, smooth surface makes it impossible to take a manual imprint.

If the Dove Hologram is on the front of the card, the account number will be printed outside the hologram. The numbers may be smaller and placed closer together.

**Cardholder Name or a Generic Title** may appear on an unembossed card. This field may be blank on some Visa cards.

**ELECTRONIC USE ONLY** communicates to cardholders and merchants that this card is a limited acceptance product and it can only be used at electronic point-of-sale terminals. Merchants without an electronic terminal should ask for another form of Visa payment. Electronic Use Only may be displayed on the front or back of the card.

## Visa Chip Card

**Visa Chip cards are embedded with a chip** that communicates information to a point-of-sale terminal.





Upper left placement of the Visa Brand Mark is allowed only on cards with a chip.